**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No.:  2:16-cr-231-RFB |
| Plaintiff, | **ORDER** |
| v. | **On** |
| | **Motion To Suppress [#23]** |
| JAY YANG | |
| Defendant. | |

### I.     Introduction

Before the Court is Mr. Yang's Motion to Suppress Evidence [ECF No. 23].  The Court held an evidentiary hearing on this Motion over the course of several days.  Based upon the record from the hearing, the Court denies the Motion to Suppress.

### II.    Procedural History

On May 9, 2016 a Criminal Complaint was filed against Jay Yang, the Defendant, charging him with one count of Theft or Receipt of Stolen Mail in violation of Title 18 U.S.C. § 1708 and one count of Felon in Possession of a Firearm in violation of Title 18 U.S.C. §§ 922(g)(1) and 924(a)(2). On July 27, 2016 a federal grand jury returned a Criminal Indictment against the Defendant charging him with one count of Theft or Receipt of Stolen Mail in violation of Title 18 U.S.C. § 1708 and one count of Felon in Possession of a Firearm in violation of Title 18 U.S.C. §§ 922(g)(1) and 924(a)(2). On October 5, 2016, Yang filed a Motion to Suppress. Evidentiary hearings were held on December 6, 2016, December 14, 2016 and January 4, 2017 on this Motion.

### III. Factual Findings

The Court held evidentiary hearings on December 6, 2016, December 14, 2016 and January 4, 2017 regarding the motion to suppress. Based upon the Court's assessment of the credibility of the witnesses and evidence presented at this hearing the Court makes the following findings of fact.

In April of 2016, the Postal Inspection Service received information that mail theft was occurring at the Summerlin Post Office located at 1611 Spring Gate Lane, Las Vegas, Nevada 89134. Upon review of surveillance video from surveillance cameras at the Summerlin Post Office, Postal Inspector Steele (hereinafter "Inspector Steele") discovered a pattern of "fishing"— a method of stealing mail from a mailbox in which an individual lowers an object – which usually has adhesive or some grasping mechanism – into the box and then retrieves mail from the box by pulling it out with this object.

From April 5, 2016 to April 8, 2016 surveillance video revealed a dark colored GMC Yukon (hereinafter "GMC Yukon") approaching and stopping at the collection boxes at the Summerlin Post Office. The driver, who appeared to be a slim white male with short hair was seen exiting the vehicle, placing fishing devices into the collection boxes. On three of the four days for this period, this individual is seen repeatedly placing fishing devices into the collection box, removing mail from devices, and placing the mail into the GMC Yukon prior to leaving the area.

On April 9, 2016, the GMC Yukon is seen with the same driver on surveillance video by Steele conducting the same "fishing" activities as seen on the previous days. On this day, the license plate for the GMC Yukon could be seen and was identified as California license plate 7RIV310.

Upon conducting a DMV records check for the GMC Yukon and the license plate number, Inspector Steele learned the vehicle was registered to Prestige Motors, a car rental company located in Las Vegas, Nevada. The GMC Yukon had been reserved and rented on a third-party website, from April 2, 2016 to April 5,2016 to Jay Yang (California ID ****4721). The credit card used for this transaction was subsequently revealed to be stolen. The GMC Yukon was scheduled to be returned to Prestige by April 5, 2016 at 10:48 a.m. When the vehicle was not returned at this time, Prestige placed it in stolen status but did not file a police report. Yang was not authorized by Prestige to use the GMC Yukon after April 5, 2016.

On April 7, 2016, afternoon surveillance video in the area of the Summerlin Post Office revealed another vehicle, a Budget rental truck with Oklahoma license plate 2QD483 (hereinafter "Budget Truck"), with what appeared to be the same driver as the GMC Yukon engaging in fishing activity with a collection box. Inspector Steele contacted Budget Truck Rental and learned that the Budget Truck had been rented to Jay Yang (CA ID ****4721) for the time frame of March 14, 2016 through March 16, 2016. The Budget Truck had not been returned pursuant to the rental agreement on the designated return date in March. Yang was not authorized by Budget to use the Budget Truck after March 16, 2016.

On April 13, 2016, Inspector Steele requested a vehicle detection report for the GMC Yukon through a commercial license plate-location database called LEARN. This database was created by and is maintained by a private company named Vigilant Solutions. The LEARN database receives license plate images and locations from digital cameras mounted on tow trucks, other vehicles used by collection/repossession companies and law enforcement vehicles. While these vehicles mounted with cameras drive around conducting whatever business they may have, the cameras are programmed to identify and photograph any license plate they encounter. Each vehicle-mounted camera set records about 30 license plate images per second. Not all

photographed license plate images are retained by the onboard camera hardware and software. The system has functions which eliminate unreadable or potentially duplicate images among other limiting functions. Thus, only a portion of these images and the location where they were recorded are retained in the onboard system and then wirelessly transmitted to the main computer server(s) for the LEARN database.

The LEARN database is not designed to continuously track a particular license plate or vehicle. A client using the database cannot request the continuous tracking of a particular license plate. A client cannot request that particular a license plate or vehicle be followed. While a particular license plate can be recorded multiples in a day, the number of times a particular license is observed and recorded depends upon its random interaction with a vehicle equipped with a digital camera set. Vehicles mounted with cameras are not required to drive in particular areas of a community.

The database receives about 35% of its images from law enforcement vehicle cameras and the remaining 65% of its images from commercial vehicle cameras. The Postal Inspection Service does not contribute any images to the LEARN database. It is only a client who uses the database. The LEARN database is limited to law enforcement and government clients. There is a companion database used just by commercial clients. This companion database only has images from commercial vehicles and not law enforcement vehicles.

On April 13, 2016, Steele requested that a Postal Inspection technician submit a query to the LEARN database for the GMC Yukon's license plate. A vehicle detection report[1] from LEARN indicated the GMC Yukon had been "spotted" in the area of 7810-7898 Tenshaw Avenue Las Vegas, Nevada on April 5, 2016. Based on that information, Inspector Steele, on April 13,

---

[1] There are actually two detection reports but they are from one encounter with the vehicle as the reports are seconds apart in terms of the timing of the observation of the target license plate. For simplicity, the Court refers to them as one report.

4

2016, went to that area and observed the GMC Yukon parked in a general community parking lot, uncovered, outside but within a gated condominium complex. The Court finds that the license plate image of the GMC Yukon and the location of the observation in the LEARN detection report was obtained from a digital camera while the GMC Yukon was on a public street and before it entered into any private property or private gated community. That is to say that Inspector Steele and law enforcement officers in this case never received any information from digital cameras associated with the LEARN database (or any other source) that peered into or visually intruded upon private property or the curtilage of private property. Moreover, the location information associated with an image in the LEARN database does not provide a specific address location. Rather, the location information associated with an image is a street block.

Additionally, the digital cameras used to collect the images are not equipped with technology that permits the cameras to view through or over solid walls or similarly solid barriers erected to protect residential or apartment privacy. The vehicles upon which the cameras are mounted are not specifically tasked with driving around a city or community for the sole purpose of capturing license plates. The cameras capture images while the vehicles upon which they are mounted generally engage in other activities unrelated to simply capturing images of license plates.

On April 13, 2016, Inspector Steele also spoke to a Postal Service letter carrier for the complex and learned that an Authorization to Hold Mail was in place, as of April 5, 2016 with no listed end date, for Jay Yang at 7821 Tenshaw Ave. Unit #103, Las Vegas, Nevada 89145. Also on April 13, 2016, Inspector Steele learned that the true owners of the residence at 7821 Tenshaw Avenue Unit #103 were S.R. and B.R., and there was no rental agreement or renter information on file, as required, with the home owner's association (hereinafter "HOA") for that unit. As Inspector Steele left the area of 7821 Tenshaw Avenue on April 13, 2016 he observed the Budget Truck used for fishing mail on April 7, 2016 parked just outside of the area and across the street. From the

sidewalk, Inspector Steele was able to observe, in plain view, fishing devices, consistent with what used on April 7, 2016, and the other dates, on the dashboard inside of the Budget Truck.

Inspector Steele obtained subscriber information from the local utility, NV Energy, for 7821 Tenshaw Ave. Unit #103. The subscriber information indicated that the power was turned on by "Jay Yang." The subscriber information for Jay Yang included a social security number that came back—from a search through a public database—to a different person residing in California. Inspector Steele also verified with the son of the true owners of 7821 Tenshaw Ave. Unit #103 that the property has not been rented to anyone nor should anyone be living in that residence.

On April 25, 2016, Postal Inspector Hudson (hereinafter "Inspector Hudson") engaged in a ruse by attempting to deliver a package to a fictitious person at 7821 Tenshaw Ave. Unit #103. Inspector Hudson knocked on the door and it was answered by a male who identified himself as "Jay Yang". Inspector Hudson could not see the male who identified himself as "Jay Yang" because he never opened the screen door.

On May 6, 2016, Postal Inspectors served a search warrant on the residence of 7821 Tenshaw Ave. Unit #103. Defendant Jay Yang, along with three other individuals, were present at the residence when the search warrant was executed. Law enforcement found inside of the bedroom belonging to Jay Yang numerous pieces of stolen mail, a Phoenix Arms model HP22 pistol, pages of profiles containing victims personal identifying information, altered checks, and bank deposit receipts. Law enforcement found in the living room devices known to be used for fishing from mailboxes, altered checks, altered money orders, a notebook containing personal identifying information, and various pieces of stolen mail. Also on May 6, 2016, Jay Yang was advised of his Miranda rights, waived his rights, and agreed to speak to law enforcement. He admitted to fishing from collection boxes in the area, including the collection boxes at the Summerlin Post Office, and stated he used devices like those found in the living room to steal mail.

Yang admitted to owning and possessing the firearm recovered from his bedroom. Yang further admitted that he bought individuals personal identifying information profiles from a website and that he used one of those social security numbers to activate the utilities for the residence.

Additionally, on May 6, 2016, Steele contacted Prestige Motors to notify them about the location of the GMC Yukon. Representatives of Prestige came to 7821 Tenshaw to repossess the GMC Yukon pursuant to their rights under the Rental Agreement. Yang did not have a right to be in possession of the vehicle at this time as he had not returned it pursuant to the Rental Agreement. When Prestige's employees arrived, they gave permission to law enforcement officers to view, search and take pictures of the inside of the GMC Yukon before the vehicle was taken away.

### IV. Legal Standard

The Fourth Amendment confers the right for people to "be secure in their persons, houses, papers and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "[W]arrantless searches and seizures are per se unreasonable" under the Fourth Amendment. United States v. Cervantes, 703 F.3d 1135, 1141 (9th Cir. 2012). The government bears the burden of showing an officer's actions fall within an exception to the warrant requirement. Id. If the government fails to show an exception to the warrant requirement, the seized individual's Fourth Amendment rights have been violated. Id. at 1143.

A citizen does not surrender all the protections of the Fourth Amendment by entering an automobile. See Delaware v. Prouse, 440 U.S. 648, 663 (1979). Nonetheless, the Supreme Court has explained that the physical characteristics of an automobile and its use generally result in a lessened expectation of privacy: "One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public

thoroughfares where both its occupants and its contents are in plain view." Cardwell v. Lewis, 417 U.S. 583, 590 (1974) (plurality opinion). The Supreme Court has explained that private citizens are aware that vehicles are subject to persistent government regulation and inspection: "Automobiles, unlike homes, are subject to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements. As an everyday occurrence, police stop and examine vehicles when license plates or inspection stickers have expired, or if other violations, such as exhaust fumes or excessive noise, are noted, or if headlights or other safety equipment are not in proper working order." South Dakota v. Opperman, 428 U.S. 364, 368 (1976). More specifically, the Supreme Court has explained that "it is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile." New York v. Class, 475 U.S. 106, 114 (1986)(holding there is no expectation of privacy in the Vehicle Identification Number ("VIN") for an automobile).

Significantly, the Ninth Circuit has held that "people do not have a subjective expectation of privacy in their license plates and that even if they did, this expectation would not be one that society is prepared to recognize as reasonable." United States v. Diaz-Castaneda, 494 F.3d 1146, 1151 (9th Cir. 2007). The Ninth Circuit further held in Diaz-Castaneda that "when police officers see a license plate in plain view, and then use that plate to access additional non-private information about the car and its owner, they do not conduct a Fourth Amendment search." Id. at 1152.

However, the Supreme Court has also held that "the Government's installation of a [Global-Positioning-System] GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search'" under the Fourth Amendment. United States v. Jones 565 U.S. 400, 404 (2012). In Jones, the Supreme Court held that the attaching of a GPS device to the underside of vehicle without the owner's consent where the vehicle ultimately ended up in the curtilage of a private home constituted a search, since it was an invasion of a constitutionally

protected area of a home. Id. at 406-08. The holding in Jones derived from an application of the "common-law trespassory test" for the determination of whether or not the particular conduct of law enforcement involved a "search" – an invasion of an area in which an individual has an expectation of privacy. Id. at 409.

Finally, "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980). As the curtilage is part of the home, searches and seizures in the curtilage without a warrant are also presumptively unreasonable. Oliver v. United States, 466 U.S. 170, 180 (1984). The Ninth Circuit has explained that courts should "examine four non-exhaustive factors to determine whether an area is part of a home's curtilage: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." United States v. Perea-Rey, 680 F.3d 1179, 1184 (9th Cir. 2012)(internal quotations and citations omitted).

## V. DISCUSSION

The Defendant argues in this case that law enforcement engaged in an unconstitutional search of Yang because it "used invasive vehicle location tracking technology to discover the GMC Yukon." The Defendant further argues that the government "used advanced tracking technology to pinpoint the location of the Yukon down to the longitude and latitude coordinates at a specific date and time." The Court rejects the Defendant's argument, because the Court finds that the government did not use 'invasive vehicle location tracking technology' without a warrant to engage in a "search" of the Yang's private property or the curtilage of his home or residence.

First, the Court notes and reiterates the following factual findings. The observations of license plate locations noted in the LEARN database do not rely upon invasive technology allowing

law enforcement officers to essentially peer into the private property of individuals. The LEARN database relies upon random observations of license plates by digital cameras placed on tow trucks or other vehicles for repossession companies and on some law enforcement vehicles. The digital cameras capture images of license plates when the vehicle with a mounted camera drives past or near another vehicle with a license plate. The program is not designed to and does not track an individual's movements or an individual automobile's movements continuously or even regularly. The program does not permit a law enforcement client to direct that a vehicle with a LEARN digital camera follow and continuously record the location of a particular automobile. The LEARN database can but does not regularly provide contemporaneous location information.

Second, the Court finds that the technology associated with the digital camera for LEARN does not permit advanced or invasive surveillance of individuals or individual automobiles. The LEARN digital cameras do not have the capability of capturing images through solid barriers such as walls erected to protect the privacy of personal property or individual movements. The technology does not have the capability of taking photos of license plates from a significant distance – that is beyond two to three standard lanes of a street. The cameras cannot be readily or easily manipulated while the vehicle upon which the camera is mounted is moving.

Third, there is no evidence in this case to suggest that law enforcement officers used the LEARN database to regularly or continuously monitor the movements of Yang or the GMC Yukon or the Budget Truck. Inspector Steele submitted only one request for a detection report from the LEARN database. The report identified a possible matching license plate and a street block where that plate had last been identified. The report was requested from LEARN on April 13, 2016 and the only reported observation was from April 5, 2016. This to say that the LEARN report did not provide and does not collect any information about where the license plate had been over the previous week or two weeks. It simply provided a block location for an observation from

approximately eight days earlier. The observation was also captured from a digital camera mounted on a commercial vehicle and not a law enforcement vehicle. The facts of this case do not demonstrate that law enforcement officers: a.) used the LEARN system to regularly monitor the movements of Yang or the GMC Yukon or Budget Truck, b.) used the LEARN system to view into the private curtilage of any residence or private property, c.) used the LEARN system to develop a history of the movements of Yang or the GMC Yukon or Budget Truck, or d.) used the LEARN system directly to track the movements of Yang or the GMC Yukon or Budget Truck on a particular day(s).

Considering all of these factors, the Court does not find in this case that Inspector Steele's use of the vehicle detection report in LEARN to identify the possible location of the GMC Yukon constituted a search of Yang or the GMC Yukon requiring a warrant. The Defendant's attempt to rely on Jones to assert that a warrantless search occurred in this case lacks legal support. That case is distinguishable from this one. The monitoring device in Jones – a GPS tracker – provided continuous contemporaneous information about the location of a vehicle, had been placed on the actual private vehicle without the owner's consent, permitted (and was intended to permit) vehicle location and tracking in private walled off communities, and created a travel history of all of the movements of the targeted vehicle. None of these facts are in play here. There was no "common-law trespass" in this case, because the GMC Yukon's license plate and the associated location was only captured when the vehicle traveled on public streets with other vehicles. No officer placed any device on the GMC Yukon or used technology targeting the Yukon which would permit law enforcement officers to peer into areas thought to be private by Yang or any other individuals. Yang does not have a reasonable expectation of privacy in the observation (and location of the observation) of the license plate of the vehicle he is driving on public streets with other vehicles. Class, 475 U.S. at 114.

Furthermore, the Court does not find that there was any form of 'electronic trespass' that might implicate a reasonable expectation of privacy. The location information in this case was not generated by Yang electronically or digitally surrendering private or confidential information to a third-party working in cooperation with law enforcement. The location information for the GMC Yukon was not identified by use of any invasive digital technology regarding its whereabouts or those of Yang. The location information was obtained through random observation(s) recorded on public streets.

Furthermore, the Court does not find that GMC Yukon was tracked or detected while in the curtilage of Yang's home or residence. It was not established that the GMC Yukon was parked near or adjacent to Yang's home. It was parked in a parking spot in a gated community but the spot was not particularly associated with Yang or his residence. And the detection occurred before the GMC Yukon was parked in this parking spot.

Finally, the Court does not find that law enforcement officers unlawfully searched the GMC Yukon on May 6, 2016 without a warrant. Officers were provided permission to view and search the vehicle by the owner of the vehicle – Prestige Motors. Yang was not in lawful possession of the vehicle at that time. Prestige Motors, as the owner of the GMC Yukon, had the right to repossess the vehicle and give permission to law enforcement to view and search its contents. The search of the GMC Yukon was by the consent of the lawful owner and not unconstitutional.

## VI. CONCLUSION

For all of the reasons previously discussed, the Court does not find that law enforcement officers in this case engaged in an unlawful warrantless search of the Defendant or his vehicle. The Motion to Suppress [ECF No. 23] is DENIED.

DATED this 25th day of January, 2018.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**